207 Okla. 310 (1952)
249 P.2d 455
In re FELGAR'S ESTATE.
FIRST PRESBYTERIAN CHURCH OF NORMAN et al.
v.
JUDD et al.
No. 33943.
Supreme Court of Oklahoma.
September 16, 1952.
Rehearing Denied October 28, 1952.
*311 Monnet, Hayes & Brown, Oklahoma City, Person Woodall, and John M. (Jack) Luttrell, Norman, for plaintiffs in error.
Joe A. Smalley and Williams & Benedum, Norman, for defendants in error.
CORN, J.
This is an appeal from a judgment of the district court holding invalid the will of Etta J. Felgar, deceased, who died without issue, and denying probate of same.
In May, 1946, testatrix suffered a cerebral hemorrhage and paralytic stroke, necessitating her removal from her home in Norman, Oklahoma, to an Oklahoma City hospital for care and treatment. At that time she was nearing 80 years of age, and suffered from diabetes and the attendant difficulties of advancing years. While confined to the hospital, her husband, J.H. Felgar, died without issue on July 19, 1946. During his last illness the pastor and some members of the First Presbyterian Church of Norman, where the Felgars had been members for many years, took charge of his business affairs. Mrs. Felgar was unable to attend her husband's funeral and, because of her condition, these church friends managed the funeral arrangements. No will by Mr. Felgar was found, and a friend of many years standing, M.L. Wardell, was appointed to administer his estate.
July 27, 1946, Mrs. Felgar was removed from the hospital to the family home in Norman. The paralytic stroke left her right side completely paralyzed. She also suffered a severe speech defect. These things, with her advanced years and general debility, made her wholly dependent upon others for even her simplest needs. The Presbyterian minister, John B. Thompson, hired three nurses who were in constant attendance for the remainder of her life. To facilitate handling matters the minister obtained a limited power of attorney (August 21, 1946) giving him authority to transact business matters for her. On September 18, 1946, another power of attorney was executed, giving to the minister and the attorney, who subsequently drafted the will, authority to open her safety deposit box. Subsequent to her return home the will herein involved was drafted and executed by her on September 24, 1946, execution thereof being witnessed by one of the nurses, and Fay Davis, a close neighbor, who was called in for this purpose. Being unable to write the testatrix's name was signed, at the attorney's direction, by Fay Davis, a subscribing witness. The testatrix then executed the will by mark, with the assistance of this witness. Mrs. Felgar suffered another stroke in January, 1947, and died March 29, 1947.
The will was presented for probate after notice was given, including the collateral kin of Mr. and Mrs. Felgar, who appear as defendants in error herein. Upon hearing, there being no contest, the will was admitted to probate by the county court. M.L. Wardell was named executor of the will *312 without bond. The will bequeathed $1,000 each to Raymond Kline, a friend, and Lena Barnett, the Felgar's housekeeper for many years. All remaining property of the estate, valued at between fifty and sixty thousand dollars, was left to the First Presbyterian Church of Norman, Oklahoma, free of restriction as to its use, other than testatrix's desire same should be used for the construction of a new church building.
April 8, 1948, the collateral heirs, defendants in error herein, instituted proceedings to set aside the county court's order admitting the will to probate, and to have the will declared null and void.
The petition of Della Rohrbough to contest the will alleged she was the sole surviving heir of J.H. Felgar, and entitled to all the interest in his estate, since he died intestate, without issue, leaving as his only heir Mrs. Felgar, deceased; that under statutes of descent and distribution, one-half of such estate descended to the heirs of J.H. Felgar, and one-half to his wife, or next of kin.
The petition of Norris and Fredd Judd alleged their right to inherit as the only heirs of Mrs. Felgar. As grounds for setting aside the order admitting the will to probate contestants alleged incompetence, undue influence, menace and duress, and that the will was void because not executed according to law.
The First Presbyterian Church, principal beneficiary, filed answer alleging admission of the will to probate; that the Felgars were active church members, interested in the welfare of the church and that the legacy was a normal act; and further denied testatrix's incompetency, or that undue influence was exerted over her in making the will.
Separate answers of the two individual beneficiaries (Kline & Barnett) alleged that the bequests to each of them had been made in recognition of valuable services rendered the Felgars, and to testatrix during her illness.
With the issues thus joined the matter was heard by the county court, and on May 7, 1948, an order was entered revoking the previous order admitting the will to probate. From this order proponents appealed to the district court where trial de novo was had upon the issues. The testimony respecting testatrix's health and mental condition was elicited from more than two dozen witnesses. The extent of the testimony, much of which was cumulative in nature, makes it impractical to attempt a detailed narrative of all the evidence.
Much of the testimony bearing upon testatrix's competency was elicited from the three nurses who attended her constantly. The substance of their testimony was that she had the mind of a child; and would be told who visitors were just before they arrived, and then could not remember the names of old friends who came in to visit her; could not recall having eaten her meals a short while after she had finished; had employees write menus upon the wall; made child-like gifts of things and then demanded their return; would go through motions of reading while holding a magazine or newspaper upside down; did not realize her husband had died, and did not know the extent of her property; following her return home from the hospital she was like a young child, unable to care for her simplest needs, and had a serious speech difficulty.
One of the nurses, Ruth Johnson, who witnessed the will, signed a statement at the hearing for admission of the will to probate, that testatrix was of sound and disposing mind. However, at this trial she testified that she did not read the statement regarding her competency before signing it. This witness admitted having received gifts from Mrs. Felgar.
*313 The other two nurses, one of whom was a registered nurse, and the other a practical nurse of many years standing, testified substantially as above set forth. Both testified that in their opinion Mrs. Felgar was not of normal mind during 1946, and was incompetent to make a will.
An immediate neighbor, Fay Davis, knew testatrix and visited her about every other day following her return from the hospital, and sometimes would not be recognized. Prior to execution of the will Mrs. Felgar seemed very upset and said: "Worry, worry, worry, make will, morning, noon, night, make will, you come." The witness agreed to come. About a week later one of the nurses called her to the Felgar house and she sat near testatrix while the attorney read the will. Witness observed testatrix closely and it was hard for her to concentrate and she seemed to lose interest before reading of the will was finished; she signed the will for testatrix at the lawyer's request, and made a mark after placing testatrix's hand in her own. When called to testify at the hearing witness refused to sign the testimony of witnesses for admission of the will to probate because she did not believe Mrs. Felgar was of sound mind. She further testified Mrs. Felgar's mind was that of a small child.
A student, who had lived in the home for several years and knew the family intimately, visited testatrix twice during July, 1946. He testified that in his opinion she was mentally incompetent when he saw her at those times, which was prior to execution of the will.
A young lady, a student who resided in the Felgar home when the will was made, saw testatrix three or four times a week, described certain things testatrix did which she considered irrational and, in substance, gave as her opinion that Mrs. Felgar was wholly incompetent.
Dr. M.P. Prosser, a specialist in psychiatry and neurology, testified that a paralytic stroke tended to damage the brain; that one suffering from the debilities and displaying the symptoms shown by testatrix, as based upon evidence as heretofore set forth, would be incompetent to make a will, and that he doubted her competency at any time following the stroke in July, 1946. Further, in his opinion, if testatrix had been examined by doctors when the will was made they could have determined whether she was mentally competent.
Raymond Kline, the beneficiary who resided in the Felgar home, testified to having discussed the making of the will with Reverend Thompson and M.L. Wardell. He was called to Reverend Thompson's study, and there advised to see the attorney and tell him to draft a will leaving her property to the church, as that is what the Felgars would want to do. The witness did as directed. He asked Reverend Thompson to have a guardian appointed, but this was not done. Based upon his observation of testatrix's conversation and conduct she was totally incompetent, and when the hearing was held in the county court he was present but was not called upon to testify as to her competency.
Fourteen of the witnesses who testified for proponents were faculty members, friends and acquaintances of the Felgars for varying periods of time. Several of these witnesses were members of the Presbyterian church, and some held official positions therein. A narrative digest of their testimony reveals that they visited her during her illness from one time to numerous times. These witnesses testified they ordinarily visited only when called, and at such times testatrix would appear rational and alert, although she did suffer from some speech difficulty; she would discuss things in a normal manner, and recall individuals and occurrences in the past. Such witnesses generally expressed as their opinion that testatrix was competent to make a will. One of the witnesses (Benton) visited quite often when asked to come *314 in for short visits. He thought her bright and alert for one so ill, and stated that although she might appear childlike to casual acquaintances, to those who had known her for years her real intelligence could be seen in spite of her condition. Certain of the witnesses testified to having heard the Felgars express some intention of leaving their property to the church, since they had no family.
Testatrix's attending physician (Ragan) testified she had lucid intervals but at other times was confused and had memory defects. During lucid intervals she was competent to make a will, but because of doubt in his own mind he advised Reverend Thompson, in response to the minister's inquiry as to her competency, to obtain a board of three doctors, one a psychiatrist, to examine her prior to drawing the will. The witness did not see Mrs. Felgar between September 10, 1946, and October 2, 1946, because this was a period when Mrs. Felgar had discharged him, and some of the nurses. However, he stated that he doubted she was improving during such period of time.
The assistant medical superintendent of Central State Hospital was a witness for proponents. He testified an individual could be paralyzed permanently by a stroke without disturbance of their mental faculties. Answering a hypothetical question which included description of the symptoms heretofore detailed concerning Mrs. Felgar's condition, he testified such person might be perfectly competent to make a will; he did not think she suffered such brain damage from the stroke as to make her incompetent; one afflicted as she might be irritable and emotional, but rational. On cross-examination, in response to a hypothetical question assuming the truth of matters related by contestants' witnesses as to her condition, this witness admitted if her conduct was continuous in such matters he would consider her incompetent.
The attorney who drafted the will testified for proponents. He drew power of attorney giving Reverend Thompson power to transact Mrs. Felgar's affairs. In August he learned from Mr. Wardell that she wanted a will drawn, and thereafter called and discussed this with her. Later he drew another power of attorney giving Reverend Thompson authority to open her deposit box; this was done and her securities listed, and he then took the list and went over same with her, at which time she commented on certain facts relating to her holdings. She discussed how she wanted to leave her property and agreed Mr. Wardell could serve as executor without bond. Reverend Thompson and Mr. Wardell had discussed the subject of her making a will with him, and he suggested having an examining board of three doctors, but they decided against this. He thought her competent, and that with the nurses' help they could pick out one of her better days for execution of the will. It was at his suggestion the church was incorporated. The day the will was executed he learned testatrix was having one of her better days. Mrs. Felgar had selected the witnesses and the will was read in the presence of all. She had a copy, and interrupted at one point to make inquiry as to the clause relative to the new church, and then recalled herself that they had agreed not to limit the bequest. In response to inquiry, she indicated a desire for Mrs. Davis to help her sign her mark, and then Mrs. Davis and the nurse signed as witnesses.
Another witness, M.L. Wardell, executor under the will, was a member of the governing body of the beneficiary church. He testified Mrs. Felgar always recognized him, could discuss any subject mentioned, and that he thought her competent. The church was incorporated September 23rd, and the will signed September 24th. He handled Mr. Felgar's estate, and felt the property was Mrs. Felgar's, to do with as she pleased. When her husband's will could not be found he suggested she make a will. Her reaction was favorable and she asked for a particular lawyer, but *315 he never discussed terms of the will with her. Raymond Kline went to the attorney's office to advise him she wished to make a will, but nothing was mentioned concerning how the property should be disposed of; he suggested a will because she should dispose of the property to suit herself. He admitted stating he would be happy if the will was drawn while he was away on a trip, but said he felt there was no need for him to be present, and wanted to avoid having anyone feel he had influenced testatrix. Witness testified sometimes she was alert and sometimes not. However, on cross-examination, in response to a hypothetical question based upon matters assumed to be true in relation to her condition, he stated that anyone in such condition probably would not be competent.
Reverend Thompson, pastor of the church when the will was drawn, testified he had known the Felgars from 1937 until their deaths, both having been active church workers. He handled Mr. Felgar's affairs from the time he was in the hospital until he died. Upon her return home Mrs. Felgar was unable to transact business and gave him a power of attorney. No will was found after Mr. Felgar's death. He discussed with her physician the subject of Mrs. Felgar's competency to make a will, and thought she was improving when the will was made.
On cross-examination this witness testified he knew of testatrix's illness and physical condition and for this reason was handling her affairs under the powers of attorney; knew of her relatives, but made no effort to find out about them; that he called regularly to see her and had discussed with the physician her competency to make a will. The physician advised him to have her examined by three other physicians, one a psychiatrist, and this information was given to the attorney.
After consideration of the case the trial court made substantially the following findings of fact: The will was admitted to probate April 28, 1947, and contestants, proper parties in interest, filed petitions in protest on April 8, 1948, and the court had jurisdiction to hear same. Testatrix suffered a paralytic stroke in May, 1946, and thereafter was physically and mentally incompetent to make a will, and was incompetent September 24, 1946. Because of her illness her affairs were handled by Reverend Thompson. She did not voluntarily suggest making a will, was incapable of knowing her heirs, the extent of her property, or those entitled to participate in her estate. That the purported will was a nullity and not entitled to probate.
Upon the foregoing findings the court concluded as a matter of law that testatrix lacked testamentary capacity at any time after May, 1946, or on September 24, 1946; and knew neither the extent of her property nor the recipients of her bounty. As a matter of law testatrix was incompetent to execute a will, and the purported will was not entitled to probate, making it unnecessary to determine whether the will was executed according to law. The court then entered judgment vacating and setting aside the order of the county court admitting the will to probate, declared the will a nullity and denied probate thereof. The appeal from the judgment rendered is based upon 33 assignments of error, presented under four general propositions.
Proponents first contend the trial court erred in refusing to sustain their demurrer to contestants' evidence, in view of the provisions of 58 O.S. 1941 § 61, which provides:
"When a will has been admitted to probate, any person interested therein may at any time within one year after such probate, contest the same or the validity of the will. For that purpose he must file in the court in which the will was proved a sworn petition in writing containing his allegations, that evidence discovered since the probate of the will, the material facts of which must be set forth, shows:
*316 "1. That a will of a later date than the one proved by the decedent, revoking or changing the former will, has been discovered, and it is offered; or,
"2. That some jurisdictional fact was wanting in the former probate; or,
"3. That the testator was not competent, free from duress, menace, fraud, or undue influence when the will allowed was made; or,
"4. That the former will was not duly executed and attested."
The sworn petition filed by the Judds alleged the matters required by the statute to be set forth. The Rohrbough petition failed to allege the facts relied upon had been discovered after the will was admitted to probate. Proponents contend that this statute requires proof that the evidence was discovered after a will has been admitted to probate, because the issues supplying grounds for an attempted contest always are matters determined by the probate court in the original hearing. Thus they argue that, in the absence of proof such facts were discovered after admission of the will to probate, the prior determination is decisive of all questions as to validity of the will, upon the principle of res adjudicata.
Supporting such argument proponents rely upon In re Impunnubbee's Estate, 49 Okla. 161, 152 P. 346; In re Blackfeather's Estate, 54 Okla. 1, 153 P. 839; In re McKee's Estate, 67 N.D. 504, 274 N.W. 601; and the recent case of Voght v. Hall, 203 Okla. 670, 225 P.2d 822. Based upon what they contend is the rule in these cases, it is urged that a prerequisite to contest of a will already admitted to probate is that there be proof the matters relied upon were discovered after the original proceeding was had.
These cases do not establish the rule urged by proponents. The Impunnubbee case, supra, pointed out that it is mandatory for a "sworn petition, * * *, etc., to be filed, and held that a failure to comply with the statute in this respect was a fatal defect. The case does not establish the rule that proof is required as to the time of discovery of the facts alleged, but only requires the statutory requisites to be fulfilled.
In the Blackfeather case, supra, the decision turned upon the point that contestants failed to allege the material facts relied upon in contest of the will had been discovered after same was admitted to probate. The evidence itself showed such facts to have been within knowledge of the contestants long before the will was filed for probate, and had not been discovered subsequent to admission of the will to probate.
The McKee case, supra, was based upon the proposition of lack of notice being given to contestants. However, the North Dakota court stated that, even though petitioners had been given notice, they still could have maintained their contest, inasmuch as their action was predicated upon evidence discovered after probate of the will.
Voght v. Hall, supra, was a recent decision from this court based upon the Impunnubbee case. Examination of the reported case reflects that the rule was applied by reason of contestants' failure to file a sworn petition alleging the matters relied upon were discovered since probate of the will. The rule in the Impunnubbee case was applied, in holding that failure to meet the statutory requirements made the petition insufficient to invoke jurisdiction of the court, so that the court had no authority to permit an amendment of the petition after expiration of the one year period.
Proponents further seek to support their argument by the following:
"Let us suppose the following fact situation:
"Plaintiff sues on an account alleging payment of the intangible property tax. However, he fails to prove payment of the tax. The question of *317 whether the tax had been paid is jurisdictional, and may be raised even in the Supreme Court for the first time. Under such circumstances it is error for the trial court to render judgment for the plaintiff when there is no proof of payment." McGill v. Cooper Supply Co., 196 Okla. 362, 165 P.2d 829; see, also, Cockrell v. Martin, 124 Okla. 284, 255 P. 1101; Parks v. Butler, 191 Okla. 329, 129 P.2d 836.
The asserted analogy between our decisions construing 68 O.S. 1941 § 1515, and the probate statute herein considered, is without force. Reading of section 1515 discloses that a plaintiff is required to allege and prove certain enumerated facts relative to assessment and payment of the intangible personal property tax. The act further provides if "* * * plaintiff fails to make the allegations herein prescribed, or if he fails to prove facts supporting such allegations when made, the action must be dismissed upon demurrer or motion of the defendant, or by the court on its own motion." The probate statute under consideration contains no such language.
In the case of In re Estate of John Hildebrand, 81 Okla. 197, 197 P. 445, we held that this statute (section 61) supra, merely provided an additional method for contesting a will after same had been admitted to probate. In that opinion is the following statement:
"In the petition facts are alleged showing that the testator was not competent and that he was not free from duress and undue influence when the will allowed was made, and it is further shown that the facts alleged have come to the knowledge of the petitioners since * * *, the date on which said will was admitted to probate, and the petition, being sworn to, substantially complied with such statutory requirements."
The specific requirements of the statute are: "* * * For that purpose he must file * * * a sworn petition in writing containing his allegations, that the evidence discovered since the probate of the will, the material facts of which must be set forth, * * *." Thereafter are enumerated four grounds, some or all of which the material facts alleged must show. Nowhere does the statute contemplate that, despite compliance with terms thereof, proof must be made that the facts alleged and sworn to were not discovered until after the will was admitted to probate.
It is next contended that the findings of fact and conclusions of law in respect to testatrix's incompetency to execute a will were contrary to the clear weight of the evidence. This contention involves consideration of two rules frequently announced by this court. The first is that the test for determining competency to execute a will is whether the testatrix had the mental capacity to know and understand the nature and consequences of her act at the very time the will was executed. In re Nitey's Estate, 175 Okla. 389, 53 P.2d 215; In re Mason's Estate, 185 Okla. 278, 91 P.2d 657; In re Martin's Estate, 199 Okla. 567, 188 P.2d 862. And, the question of testamentary capacity is a question of fact. In re Wilkins' Estate, 199 Okla. 249, 185 P.2d 213.
The second rule to be considered most recently was restated in Re King's Estate 202 Okla. 334, 213 P.2d 844, as follows:
"The contest of a will is a matter of equitable cognizance and the findings and judgment of the trial court will not be reversed on appeal unless the same are clearly against the weight of the evidence."
No purpose would be served by an extended discussion and comparison of the fact situations revealed in the many cases cited, wherein competency to make a will, or a trial court's finding as to incompetency, have been upheld on appeal. We have reviewed this record carefully, bearing in mind that the test to be applied is whether testatrix had any capacity to know and understand the nature and result of her acts *318 at the time the will was made. Bilby v. Stewart, 55 Okla. 767, 153 P. 1173. The evidence touching upon Mrs. Felgar's competency was highly conflicting. Without reflection upon any witness, it may justly be said that certain of this testimony is entitled to greater weight because of the situation of the witnesses. It is unnecessary to further review the testimony. Even when viewed in a light favorable to proponents, it is impossible to say the trial court's judgment was clearly against the weight of the evidence. In such instances the rule last quoted must be controlling. See, also, Amos v. Fish, 193 Okla. 406, 144 P.2d 967.
By reason of the conclusion reached it is unnecessary to consider other questions raised by proponents.
Judgment affirmed.
ARNOLD, C.J., and DAVISON, JOHNSON, and BINGAMAN, JJ., concur. HALLEY, V.C.J., and WELCH, GIBSON, and O'NEAL, JJ., dissent.